UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 07-49-01 (JMR/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Modesto Guzman Tlaseca, | |
| Defendant. | |

Joseph T. Dixon, Assistant United States Attorney, for the Government.
Lee R. Johnson, Esq., for Defendant.

**THIS MATTER** came before the undersigned United States Magistrate Judge on May 9, 2007, on Defendant's Motion to suppress statements [#76] and Defendant's Motion to suppress evidence obtained as a result of search and seizure [#77]. At the hearing, the Court received testimony from Drug Enforcement Administration ("DEA") Special Agent Jeffrey J. Fiance (hereinafter "Special Agent Fiance"). The Government submitted three exhibits at this hearing. Government's exhibit number one is a document search warrant for an address in Minneapolis. Government's exhibit number two is a second search warrant for the same address in Minneapolis. Government's exhibit number three is a search warrant for an address in Richfield. This matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends that Defendant's Motions be denied.

## I. FINDINGS OF FACT

Special Agent Fiance testified at the hearing on this matter on May 9, 2007. Special Agent Fiance has been employed with the DEA for approximately six years. During his six years of

employment with the DEA, Special Agent Fiance has received training in conducting criminal investigations. This training includes a 16 week course of specialized training with the DEA, which focused on methods of unlawful drug trafficking and the means by which drug traffickers "derive, launder and conceal their profits from drug trafficking." (Ex. 1 at 2.) Special Agent Fiance was the affiant for all three search warrants submitted into evidence in the present case. All three warrants contain the following facts.

Special Agent Fiance stated in his affidavit that, since August 2005, the DEA, Immigration and Customs Enforcement ("ICE") and the Anoka-Hennepin Drug Task Force ("AHDTF") have been investigating the illegal activities of a drug trafficking ring dubbed the "Guzman-Tlaseca Drug Trafficking Organization" (hereinafter referred to as "DTO"). (Ex. 1 at 8 ¶ 7.) Special Agent Fiance stated that the DTO was based in Minneapolis, Minnesota, and was suspected of distributing multiple-pound quantities of methamphetamine throughout the greater metropolitan area. (Ex. 1 at 8 ¶ 7.) Special Agent Fiance stated that the DTO is believed to be associated with a source of supply in Los Angeles, California. (Ex. 1 at 8 ¶ 7.)

Special Agent Fiance noted that the investigation into the DTO revealed that Defendant Modesto Guzman Tlaseca (hereinafter referred to as "Defendant") works with Defendant Garciduenos and Pedro Gil-Garcia to distribute methamphetamine in Minnesota. (Ex. 1 at 8, ¶ 8.) Special Agent Fiance stated that Garciduenos and Gil-Garcia organize the distribution of the methamphetamine to lower level distributors in Minnesota and coordinate the return of drug proceeds from the sale of methamphetamine in Minnesota for Defendant. (Ex. 1 at 8, ¶ 8.) Special Agent Fiance noted that police suspected Maria De Haro ("De Haro") of assisting Defendant with the distribution of methamphetamine. (Ex. 1 at 8, ¶ 8.)

The affidavit notes that public records reveal that Defendant is the record owner of the residence in Minneapolis (hereinafter "Minneapolis residence") that was the subject of the search warrants admitted as Government's Exhibit number one and number two. (Ex. 1 at 9, ¶ 10; Ex. 2.) Surveillance was conducted on the Minneapolis residence and surveillance officers observed a gold Chevrolet Blazer (hereinafter "Blazer") parked outside. The Blazer is registered to De Haro, and the registered address for the Blazer is the Minneapolis residence. (Ex. 1 at 10 ¶ 12.)

In November 2006, a confidential source (hereinafter referred to as "CS-1") informed law enforcement that Defendant had rented a residence in Richfield (hereinafter referred to as the "Richfield residence") that was possibly being used to store and coordinate the distribution of methamphetamine. (Ex. 1 at 10 ¶ 13.) In addition, information was provided to law enforcement by an AHDTF confidential reliable informant (hereinafter referred to as "CRI-1") and a confidential informant for the Scott County Sheriff's Department (hereinafter referred to as "CI-1"), that indicated that Defendant was distributing methamphetamine from both the Richfield residence and the Minneapolis residence. (Ex. 1 at 10 ¶ 13.) Special Agent Fiance stated in his affidavit that CS-1 had previously provided information that he deemed reliable and that law enforcement officers were able to corroborate. Special Agent Fiance further stated that CS-1 had conducted a controlled buy of methamphetamine from Defendant on May 5, 2006. (Ex. 1 at 11 ¶ 14.) Special Agent Fiance also stated that "CRI-1 has provided names and telephone numbers of individuals known to be involved in the distribution of narcotics in the past, which has led to seizures of narcotics and which has been independently corroborated and found to be true and correct." (Ex. 1 at 11 ¶ 15.) Special Agent Fiance further stated that, on June 22, 2006, CRI-1 reported that Defendant stores methamphetamine in a gold Blazer underneath the dashboard. (Ex. 1 at 11 ¶ 17.) On December 5,

2006, Special Agent Jeff Hartford conducted surveillance at the Richfield residence and observed the Blazer at the address, and other surveillance personnel have also observed the Blazer at the Richfield residence. (Ex. 1 at 11 ¶ 16.)

In his affidavit in support of all three search warrants, Special Agent Fiance noted that the Xcel Energy records for the Richfield residence list Maria De Haro as the customer of record, and that the CenterPoint Energy records for the Richfield residence list Maria Dehar as the customer of record. Special Agent Fiance further noted that the telephone number provided for both of these accounts is the same telephone number and the United States Postal Service has confirmed that Defendant and De Haro are the only mail recipients for both the Minneapolis and Richfield residences. (Ex. 1 at 12 ¶¶ 18-20.)

In his affidavit in support of all three search warrants, Special Agent Fiance also noted that in July 2005 AHDTF detectives received information from a confidential informant (hereinafter "CI-2") that methamphetamine was being stored at and sold from the Minneapolis residence. (Ex. 1 at 13 ¶ 21.) A search warrant was executed on the residence on July 6, 2005, and Defendant and another individual were present at the time of its execution. At the time of the execution of the search warrant, police seized approximately 3 ounces of methamphetamine, and Defendant was arrested. (Ex. 1 at 13 ¶¶ 22-23.)

In his affidavit in support of all three search warrants, Special Agent Fiance related the facts surrounding several controlled purchases of narcotics. During April and May, 2006, a series of controlled purchases were conducted. On April 26, 2006, CI-1 went to a second residence in Minneapolis and purchased 18.71 grams of methamphetamine for $750.00 from Defendant. (Ex. 1 at 14 ¶ 25.) On April 27, 2006, CI-1, accompanied by an undercover officer who waited outside,

went to the Minneapolis residence and purchased 88.75 grams of methamphetamine for $3,900.00 from Defendant. DEA agents monitored the transaction through an electronic listening device that CI-1 was wearing. CI-1 informed officers that there was a Hispanic female present during this transaction and that Defendant handed the money exchanged during the controlled purchase to the Hispanic female. (Ex. 1 at 14 ¶¶ 26-27.)

On April 28, 2006, CI-1, accompanied by a DEA undercover agent, purchased approximately 16.75 grams of methamphetamine for $750.00 from Defendant at the Minneapolis residence. (Ex. 1 at 14-15 ¶ 28.) On May 5, 2006, CS-1 purchased approximately 15.30 grams of methamphetamine from Defendant Garciduenos at a second residence in Minneapolis. (Ex. 1 at 15 ¶ 29.) On May 17, 2006, CS-1 and an undercover DEA agent purchased approximately 58.75 grams from Defendant Garciduenos at a second residence in Minneapolis. (Ex. 1 at 15 ¶ 30.)

On December 19, 2006, Minnesota Bureau of Criminal Apprehension Special Agent Ron Woolever (hereinafter "Special Agent Woolever") purchased approximately five ounces of methamphetamine from Defendant Garciduenos, in an undercover capacity, in International Falls, Minnesota. (Ex. 1 at 15 ¶ 31.) On December 28, 2006, Special Agent Woolever conducted a controlled purchase from Defendant Garciduenos for approximately 8 ounces of suspected methamphetamine in International Falls, Minnesota. At the conclusion of this purchase Defendant Garciduenos was placed under arrest. (Ex. 1 at 15 ¶ 32.)

Prior to the December 28, 2006, controlled purchase, Ruben Rodriguez Navarez and Maria Del Carmen Pina were observed driving in a separate vehicle that was caravanning with the vehicle Defendant Garciduenos drove to International Falls. During the controlled purchase on December 28, 2006, Defendant Garciduenos told Special Agent Woolever that Ruben Rodriguez Navarez knew

about the drug transaction. (Ex. 1 at 16 ¶ 33.) Ruben Rodriguez Navarez was also arrested at the conclusion of the controlled purchase on December 28, 2006, and he stated in a Mirandized interview that a Hispanic male he knew as "Rey" had given him a phone to use. (Ex. 1 at 16 ¶ 35.) During searches incident to arrest and state issued search warrants on the vehicles driven by Ruben Rodriguez Navarez and Defendant Garciduenos, two cellular telephones were seized and Special Agent Woolever identified a common number in these two phones. (Ex. 1 at 16 ¶ 36.) Special Agent Woolever called the common number and spoke to an individual who identified himself as "Rey". "Rey" did not speak English fluently, and therefore handed the phone to a female who identified herself as Erika. Erika admitted that Defendant Garciduenos was in International Falls to sell methamphetamine to Special Agent Woolever and to obtain money from Special Agent Woolever from a previous drug transaction between the two. (Ex. 1 at 16-17, ¶¶ 37-38.) Special Agent Woolever spoke with Erika several times and Erika agreed to meet him at the Black Bear Casino in Carlton County to deliver him an additional half pound of methamphetamine. (Ex. 1 at 17 ¶ 39.)

On December 29, 2006, Special Agent Woolever met with Erika at the Black Bear Casino and purchased one-half pound of suspected methamphetamine. Erika was arrested at the conclusion of this purchase and was identified as Erika Placensia. (Ex. 1 at 17 ¶ 40.) At the time of her arrest, Erika had a cellular telephone on her person that also contained "Rey's" telephone number. (Ex. 1 at 17 ¶ 41.) During a subsequent Mirandized statement, Erika told Special Agent Woolever that Reyner Diaz Figueroa was "Rey" and that Rey was the source of the methamphetamine that she and Defendant Garciduenos sold to Special Agent Woolever. (Ex. 1 at 18 ¶ 42.) On December 29, 2006, Erika, accompanied by special agents of the Minnesota Bureau of Criminal Apprehension,

identified the Richfield residence as Rey's "stash house". Erika indiated that, within 48 hours of December 29, 2006, she had seen methamphetamine at the Richfield residence. (Ex. 1 at 18 ¶ 43.) While identifying the Richfield residence, Erika saw an individual outside of the residence who she identified as Reyner Diaz Figueroa. Erika also picked Defendant's photogaph out of a photographic array and identified him as someone she had seen at the Richfield residence, and as someone she had seen give money to Reyner Diaz Figueroa. (Ex. 1 at 18 ¶ 45.) Special Agent Fiance stated in his affidavit that, prior to the International Falls incidents described above, CS-1 had reported that Garciduenos was distributing methamphetamine out of the Richfield residence, and DEA and ICE special agents previously had identified the Richfield residence as a suspected "drug stash location" for the DTO. (Ex. 1 at 18-19, ¶46.)

     **A.**     **The First Search Warrant Executed on the Minneapolis Residence**

On January 17, 2007, Special Agent Fiance applied for the first search warrant to search the Minneapolis residence, and that application requested the authority to search for documents relating to the transportation, distribution and manufacturing of narcotics. (Ex. 1.) The first search warrant was executed on January 18, 2007, at approximately 2:15 p.m. (Ex. 1.)

Special Agent Fiance stated in his affidavit in support of the first search warrant that it is common for drug traffickers to keep drug records to assist in the collection of narcotics debts. (Ex. 1 at 5.) After making this statement, Special Agent Fiance wrote, in Exhibit 1, in his own handwriting, that "[a]s of December 2006, your affiant has information received from a CRI that detailed drug ledgers were being kept at the residence [in Minneapolis]." (Ex. 1 at 5.) During the hearing on this matter, Special Agent Fiance testified that the CRI he referred to in this handwritten notation was also mentioned on page 11, in paragraph 17 of the application in support of search

warrant number one. Special Agent Fiance testified that the CRI mentioned in this handwritten notation was the same person as CRI-1 identified on page 11, in paragraph 17.

### B.     The Second Search Warrant Executed on the Minneapolis Residence

Special Agent Fiance was the affiant for the application in support of the second search warrant for the Minneapolis residence. (Ex. 2.) In the application Special Agent Fiance incorporated by reference the facts related in the application for the first search warrant, as described above. (Ex. 2 at 6 ¶3.) The second search warrant requested permission to search the Minneapolis residence for controlled substances and drug trafficking paraphernalia, in addition to documents evidencing narcotics trafficking. (Ex. 2 at 3.) In further support of a second search warrant, Special Agent Fiance related the details of the execution of the first search warrant. In his affidavit, Special Agent Fiance noted that, during the execution of the first search warrant, DEA Special Agent Tyrone Guyse searched a bedroom and, on the wall of the bedroom, noticed a light switch without a face plate. Special Agent Guyse further observed a piece of paper in the hole near the switch, and when he pulled the paper out he found that it was a folded $20 bill. When Special Agent Guyse unfolded the $20 bill he discovered that it contained approximately one gram of suspected methamphetamine. A field test of the substance indicated it was positive for the presence of methamphetamine. (Ex. 2 at 7 ¶ 5.)

In addition, during the execution of the first search warrant, DEA Special Agent Kevin Blackmon discovered a similarly folded $10 bill in a chest of drawers in another bedroom at the Minneapolis residence, and the $10 bill also field tested positive for the presence of methamphetamine. (Ex. 2 at 7 ¶ 6.) In addition to these two discoveries, law enforcement officers found other items in the basement that were consistent with a narcotics trafficking operation,

including cut open heat sealed bags, a stack of unsued ziplock bags in a duffel bag, and a white powdery substance that, while it did not test positive for the presence of a controlled substance, appeared to be cut material that is commonly used to increase the volume of controlled substances. (Ex. 2 at 7-8 ¶ 7.) Special Agent Fiance further noted that CS-1 told Special Agent Fiance that, approximately four to six weeks prior to the execution of search warrant number one, CS-1 observed Defendant in the possession of approximately two pounds of methamphetamine in the basement of the Minneapolis residence. (Ex. 2 at 8 ¶8.) The second search warrant was issued on January 18, 2007, at 4:54 p.m. (Ex. 2 at 1.)

### C.   The Third Search Warrant Executed on the Richfield Residence.

On January 17, 2007, Special Agent Fiance applied for a search warrant to search the Richfield residence for controlled substances, narcotics trafficking paraphernalia, and documents or other written evidence relating to the transportation, ordering, purchase or distribution of controlled substances. (Ex. 3.) The facts stated in support of the warrant to search the Richfield residence are identical to the facts related above, except that the application for the third search warrant does not contain the handwritten notation of Special Agent Fiance. The third search warrant was issued on January 17, 2007, at 4:00 p.m. (Ex. 3 at 1.)

Defendant now moves to suppress any evidence seized as a result of the execution of these three search warrants, as Defendant argues that the search warrants were not supported by probable cause. Defendant further argues that any statements made by Defendant subsequent to the execution of any of these warrants are inadmissible as any such statements would be fruit of the unlawful search. The Government conceded at the hearing that the statements obtained from Defendant were a direct result of the execution of the search warrants in this case. Therefore, the issue currently

9

before the Court is whether these warrants were supported by probable cause.

## II.   CONCLUSIONS OF LAW

### A.   The Affidavits in Support of the Search Warrants Provided Probable Cause for the Issuance of the Search Warrants.

Defendant challenges the search warrants issued in this case on their four corners. Searches conducted pursuant to a warrant are reviewed to determine whether the information in the warrant application and supporting affidavit provided probable cause for the search. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.2000) (citing *Gates*, 462 U.S. at 236). When determining whether probable cause exists, a court does not evaluate each piece of information independently, but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen,* 297 F.3d 790, 794 (8th Cir.2002). The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir.2004).

In reviewing the decision of the issuing court, this Court must ensure that the issuing court " 'had a substantial basis for . . . conclud[ing] that probable cause existed.' " *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir.2003) (quoting *Gates*, 462 U.S. at 238-39.) Since reasonable minds may differ on whether a particular search warrant affidavit establishes probable cause, the

issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir.1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

As noted by the Eighth Circuit, "[w]hen an affidavit is based in substantial part on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations-but not independent, essential elements-in finding probable cause." *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir.1986) (citing *Gates*, at 230; *United States v. Ross*, 713 F.2d 389, 393 (8th Cir.1983)). As explained by the United States Supreme Court in *Gates*, the reliability and basis of knowledge of an informant

> are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.

462 U.S. at 233. The Eighth Circuit relied on *Gates* in *United States v. Anderson* when the court noted that "an informant's basis of knowledge [is] an important consideration, but not a rigid requirement, in the probable cause determination." 933 F.2d 612, 615 (8th Cir.1991) (citing *Gates*, 462 U.S. at 230).

In the present case a reasonable person could believe there was a fair probability that contraband or evidence of a crime would be found at the Minneapolis residence and the Richfield residence. Turning first to the document search warrant initially requested for the Minneapolis residence, the Court concludes that probable cause existed for the issuance of the first warrant. Special Agent Fiance testified that the CRI who informed him that "detailed drug ledgers were being kept" at the Minneapolis residence was the same person as CRI-1, who is discussed on page 11, paragraph 17 of the application in support of the search warrant. The Court concludes, based on the testimony of Special Agent Fiance, that the CRI mentioned in Special Agent Fiance's handwritten

notation on page five of the application is the same person as the CRI-1 referred to in paragraph 17. Furthermore, upon reading the application in support of the search warrant, it is clear that CRI-1, referred to in paragraph 17, is the same CRI-1 who is identified in paragraph 13 and 15. Paragraph 15 clearly states that "CRI-1 has provided names and telephone numbers of individuals known to be involved in the distribution of narcotics in the past, which has led to seizures of narcotics and which has been independently corroborated and found to be true and correct." (Ex. 1 at 11 ¶ 15.)

Paragraph 15 clearly sets out the reliability of CRI-I, as it states that CRI-I has provided law enforcement with reliable information in the past. This reliable CRI provided Special Agent Fiance with information that "detailed drug ledgers" were being kept at the Minneapolis residence as of December 2006. (Ex. 1 at 5 ¶ 6(i).) As stated by the United States Supreme Court, a deficiency in the informant's basis of knowledge may be compensated for by a strong showing of reliability. *Gates*, 462 U.S. at 233. In the present case, while CRI-1's basis of knowledge is not discussed in the affidavit, the reliability of CRI-1 is clearly established. Looking at the totality of circumstances in the present case, a reasonable person could believe there was a fair probability that documents detailing a narcotics trafficking organization would be found in the Minneapolis residence.

Turning next to the second search warrant, a reasonable person would believe that there was a fair probability that controlled substances would be discovered at the Minneapolis residence. While executing the first search warrant, two separate officers discovered folded United States currency that contained a substance that field tested positive for methamphetamine. In addition to discovering small amounts of methamphetamine, law enforcement also discovered other items consistent with illegal narcotics trafficking, including cut open heat sealed bags, a stack of unused zip lock bags in a duffel bag, and a white powdery substance that appeared to be material used to

increase the volume of methamphetamine for sale. Based on this evidence, a reasonable person would believe that there was a fair probability that controlled substances would be discovered at the Minneapolis residence.

Finally, turning to the third search warrant, a reasonable person would believe that there was a fair probability that controlled substances would be discovered at the Richfield residence. Information provided by CS-1, CRI-1 and CI-I indicated that Defendant distributed methamphetamine out of the Richfield residence. Both CS-1 and CRI-1 previously provided reliable information to law enforcement that officers were able to corroborate. Furthermore, CS-1 and CI-1 also conducted controlled purchases of methamphetamine from Defendant. Therefore, CRI-I, CI-1 and CS-1 were reliable informants who had previously provided corroborated information to law enforcement.

In addition to this information, the United States Postal Service confirmed that Defendant and Maria De Haro were the only mail recipients receiving mail at the Richfield residence. Law enforcement then engaged in a series of controlled purchases that culminated in the arrest of Defendant Garciduenos and Rodriguez Navarez, both of whom were discovered to have cellular telephones that each contained a common telephone number. Special Agent Woolever called the common telephone number and spoke to a man named Rey. Rey handed the telephone to a woman named Erika, and Erika confirmed that Defendant Garciduenos was in the International Falls area to complete a purchase with Special Agent Woolever. Special Agent Woolever then arranged a controlled purchase with Erika, and after Erika provided him with one half pound of methamphetamine she was arrested. Upon her arrest Erika informed Special Agent Woolever that Rey was Reyner Diaz Figueroa and was the source of methamphetamine for herself and Defendant

Garciduenos. Accompanied by agents of the Minnesota Bureau of Criminal Apprehension, Erika identified the Richfield residence as Rey's "stash house" and also identified a man standing outside of the Richfield residence as "Rey". Erika also conducted a photographic array and identified Defendant as someone who she had seen at the Richfield residence and someone who she had seen give money to Rey.

Looking at the totality of the circumstances in the present case, a reasonable person could believe there was a fair probability that controlled substances and evidence of narcotics trafficking would be discovered at the Richfield residence. The Court concludes that probable cause existed for the issuance of all three search warrants in this case. Therefore, the Court recommends that Defendant's motion to suppress evidence obtained as a result of search and seizure be denied. As the Court concludes that probable cause existed for the issuance of each of the three warrants in the present case, the Court recommends that Defendant's motion to suppress statements be denied, because these statements were not the fruit of an unlawful search.

**B.      The Good Faith Exception to the Warrant Requirement Applies to the Present Case and All Evidence Seized During the Execution of the Search Warrants is Admissible.**

Even if this Court were to determine that the applications in support of these search warrants did not provide probable cause for the issuance of search warrants, the officers who executed the search warrants did so in the good faith belief that the search warrants were supported by probable cause, as they had each been issued by a United States Magistrate Judge who determined that probable cause existed. The good-faith exception to the exclusionary rule provides that evidence will not be excluded where police officers reasonably rely on a search warrant issued by a neutral judicial officer, even if that search warrant is later declared invalid. *See United States v. Leon*, 468

U.S. 897, 925-26 (1984). The officers in this case reasonably relied on the search warrants that were issued by a neutral judicial officer; therefore, even if the search warrants in this case were not supported by probable cause, the evidence seized as a result of the execution of those search warrants is still admissible. To the extent that the statements taken from Defendant are the fruit of the search, those statements are admissible, along with all other fruits of the search, pursuant to the good faith exception.

### III.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to suppress statements [#76] be **DENIED** and Defendant's Motion to suppress evidence obtained as a result of search and seizure [#77] be **DENIED**.

DATED: May 16, 2007               s/ *Franklin L. Noel*
                                  FRANKLIN L. NOEL
                                  United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **June 5, 2007**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **June 5, 2007,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.